

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

LORILLARD TOBACCO COMPANY, )
a Delaware Corporation )
)
    Plaintiff, )
)
v. ) No: 03 C 5506
)
J.J. SHELL FOOD MART, Inc., and )
JAMES JOSEPH ) Judge John W. Darrah
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Lorillard Tobacco Company ("Lorillard"), filed a six-count complaint pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq., seeking damages and injunctive relief against Defendants, J.J. Shell Food Mart, Inc. ("J.J. Shell") and its owner, James Joseph. J.J. Shell is a combination gas station and convenience store that sells, *inter alia,* cigarettes, including the Newport brand cigarettes that are at the heart of this case. Count I alleges that the Defendants infringed Plaintiff's registered trademarks in violation of 15 U.S.C. § 1114(1). Count II alleges the use of false designations of origin and false and misleading descriptions and representations in violation of 15 U.S.C. § 1125(a). In Count III, Plaintiff alleges trademark dilution in violation of the Trademark Act of 1946, 15 U.S.C. § 1125(c). Counts IV through VI allege state trademark dilution in violation of 765 ILCS 1036/65, unfair competition, deceptive trade practice

in violation of Illinois law, and statutory unfair competition in violation of 815 ILCS 510/2 et seq. Presently pending before the Court is Plaintiff's Motion for Partial Summary Judgment.

## FACTS

The undisputed facts, for the purposes of this motion, are taken from the parties' Local Rule 56.1(a) & (b) statements of material facts and exhibits ("Pl.'s 56.1" and "Defs.' 56.1").

Plaintiff Lorillard is the fourth largest tobacco company in the United States. (Pl. 56.1 ¶ 1,7). Plaintiff manufactures and sells Newport brand cigarettes, which were first introduced to the market in 1956 and have become the second leading brand of cigarettes in the United States. (Pl. 56.1 ¶ 8, 10). Plaintiff and its affiliates own five valid and subsisting federal trademark registrations issued by the United States Patent and Trademark Office for its Newport cigarettes: Reg. No. 1,108,876; Reg. No. 1,178,413; Reg. No. 1,191,816; Reg. No. 1,920,066; and Reg. No. 2,600, 870. (Pl. 56.1 ¶ 11). All of these marks, save one, have reached incontestable status pursuant to 15 U.S.C. § 1115(b). (Pl. 56.1 ¶ 11). Plaintiff uses all five of the registered trademarks on each pack and carton of Newport brand cigarettes. (Pl. 56.1 ¶ 12).

Plaintiff recognized a growing problem with the trafficking in counterfeit cigarettes in 2002-2003. (Pl. 56.1 ¶ 17-18; Defs.' 56.1 ¶ 17-18). On August 20, 2002, Plaintiff sent a letter to all its retailers warning that counterfeit cigarettes were on the market and a second letter on April 10, 2003, which warned retailers to be suspicious of cigarettes sold at low prices, although there is a dispute about whether the Defendants received these letters. (Pl. 56.1 ¶ 17-18; Defs.' 56.1 ¶ 17-18).

Defendant J.J. Shell Food Mart is a combination gas station and grocery store, which sells, *inter alia*, cigarettes manufactured by the Plaintiff. (Pl. 56.1 ¶ 2, 40; Defs.' 56.1 ¶ 1).

Defendant James K. Joseph is J.J. Shell's owner and president and the owner of 50 percent of its stock. (Pl. 56.1 ¶ 4). Mr. Joseph had sole responsibility for purchasing and determining the appropriate purchase price for cigarettes bought for the J.J. Shell Food Mart. (Pl. 56.1 ¶ 36-37). In 2003, the Defendants typically purchased between fifteen and thirty cartons of Newport cigarettes per week from Eby Brown and Midwest Cash and Carry, well-known wholesalers of Newport cigarettes. (Pl. 56.1 ¶ 38 - 39). The Defendants had purchased genuine Newport brand cigarettes from both suppliers for many years. (Pl. 56.1 ¶ 40).

For the nearly month-long period between June 28, 2003 and July 26, 2003, the Defendants did not purchase any Newport cigarettes from these customary suppliers. (Pl. 56.1 ¶ 43). On July 8, 2003, the Defendants purchased purported Newport cigarettes from Canstar U.S.A./Cam-Kat, Inc., a supplier with whom the Defendants had never done business. (Pl. 56.1 ¶ 45-46;Defs.' 56.1 ¶ 7). It is the purchase of these cigarettes – which turned out not to be genuine – which lies at the center of this case.

The cigarettes were purchased at a significantly lower price than that offered by either of the merchants who regularly supply the Defendants with Newport cigarettes. The Defendants purchased the cigarettes in question at a price of $34.00 per carton versus the $40.93 charged by the regular suppliers. (Pl. 56.1 ¶ 46). Second, the price was so low that Defendant Joseph was prompted to ask the Canstar, U.S.A./Cam-Kat, Inc. delivery person whether there were any problems with the cigarettes. (Pl. 56.1 ¶ 52). Third, the cigarettes were purchased from the back of a van, from a person and a business with whom J.J. Shell and Joseph had never previously transacted. (Pl. 56.1 ¶ 49).

3

On August 11, 2003, a Lorillard sales representative named H. Silva visited the J.J. Shell Food Mart. (Pl. 56.1 ¶ 21). While at the store, Silva observed cartons of suspected counterfeit Newport cigarettes on J.J. Shell's shelves and purchased one the cartons of the suspected counterfeit cigarettes. (Pl. 56.1 ¶ 22). Silva did not mention to any of the J.J. Shell employees present during his visit – two in addition to Defendant Joseph – anything about counterfeit cigarettes. (Defs.' 56.1 ¶ 5). Silva then sent the carton of suspected counterfeit Newport cigarettes to Lorillard's corporate headquarters to verify that the cigarettes were counterfeit. (Pl. 56.1 ¶ 23).

At corporate headquarters, Ed O'Brien, another Lorillard employee, determined that the cigarettes found at J.J. Shell were counterfeit. (Pl. 56.1 ¶ 24). In determining that the suspected counterfeit cigarettes found by Silva were, in fact, counterfeit, O'Brien determined that the tear tab on the cigarette packs from J.J. Shell were the wrong length, that the date code on the packs and carton found at J.J. Shell were out of date, and that the cigarette packs had, in fact, been printed by a different printing method than that used for genuine Newport cigarettes. (Pl. 56.1 ¶ 25).

Plaintiff's counsel obtained an *ex parte* seizure order from this Court on August 8, 2003. (Pl. 56.1 ¶ 26). Plaintiff executed a search and seizure at J.J. Shell on August 11, 2003. (Pl. 56.1 ¶ 28). During the search and seizure at J.J. Shell, Plaintiff seized one (1) full carton of counterfeit Newport cigarettes. (Pl. 56.1 ¶ 28). The cigarettes seized from J.J. Shell on August 11, 2003, bore the following indicia of counterfeiting: a "1003|T" carton code; a "103T51" pack code; a crisp, clear "Lorillard" logo, where genuine packs bear only a blurry logo and a shorter cellophane teartab than present on genuine packs of Newport brand cigarettes. (Pl.

56.1 ¶ 30). The cigarettes found at J.J. Shell, as well at other Chicago-area retailers investigated by Lorillard between June of 2003 and February of 2004, bear identical indicia of counterfeiting as those found at Cam-Kat, Inc., including the "103T51" pack code, the "1003;T"carton code, the clear Lorillard logo, and the improperly sized tear tab.[1] (Pl. 56.1 ¶ 35).

According to an investigation conducted by Defendant Joseph, none of his employees knew how to identify counterfeit cigarettes, including looking at tabs, logos, or code numbers. (Defs.' 56.1 ¶ 6). The first time that Joseph became aware that the Plaintiff believed that Canstar U.S.A./Cam-Kat, Inc. was distributing counterfeit cigarettes was in 2004, in connection with this lawsuit. (Defs.' 56.1 ¶ 9).

Plaintiff now moves for partial summary judgment and an award of damages.

## DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate under Rule 56(c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

---

[1] Defendants moved to strike this fact here and above. However, this is a matter of public record of which the Court may take judicial notice.

5

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson*, 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

### *Defendants' Liability*

Plaintiff has moved for summary judgment on the issue of liability on Count I, arguing that trademark infringement occurred and that the Defendants are strictly liable for that infringement. Because sellers bear strict liability for violations of the Lanham Act, even dealers who unknowingly sell goods that bear an infringing mark are liable for trademark infringement.[2] J. Thomas Mccarthy, Mccarthy on Trademarks and Unfair Competition, §25.10 (4th ed. 2002);

---

[2] The Lanham Act provision on liability makes no mention of intention. It provides:

(1) Any person who shall, without the consent of the registrant–

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

*15 U.S.C.A. § 1114.*

*see also Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143, 1152 n.6 (7th Cir. 1992).

In order to succeed on its claims of trademark infringement and counterfeiting, Plaintiff need only show, first, that its marks are protectable and, second, that their use by Defendants are likely to result in confusion on the part of consumers. *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001) (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000)).

Once a trademark is registered, it is presumed to be valid absent proof of a legal defense or defect. *Packman*, 267 F.3d at 638; *see also* 15 U.S.C. § 1115(b). In the instant case, there is a presumption that Plaintiff's marks are protectable and valid because the five counterfeited trademarks are registered. *Packman*, 267 F.3d at 638; 15 U.S.C. § 1115(a).

The question, then, turns on whether Defendants' use of the mark was likely to cause consumer confusion. Typically, the existence of consumer confusion is a question of fact, but it can be answered on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001) (citing *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 83 F.3d 169, 173 (7th Cir. 1996)). Courts employ a seven-factor test to determine the likelihood of confusion by use of a protected trademark:

> (1) the similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the Plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the Plaintiff.

*CAE Inc.*, 267 F.3d at 667-68, and cases cited therein. While no single factor is dispositive, three

7

of the factors have been deemed by courts to be particularly important: the similarity of the marks, evidence of actual confusion, and the defendant's intent. *CAE Inc.*, 267 F.3d at 668.

Here, the first factor is met because the packaging of the counterfeit cigarettes obtained from the Defendants' store are virtually indistinguishable from the packaging for genuine Newport cigarettes. Plaintiff's own sales representative needed confirmation from employees at corporate headquarters to confirm that the packs and cartons obtained were counterfeit.

The second and third factors are met because the counterfeit products are the exact same type of goods as Plaintiff's genuine cigarettes and because when the counterfeit carton of Newport cigarettes were seized from the Defendants on August 8, 2003, the single carton of counterfeit Newport brand cigarettes was displayed amid other cartons of authentic Newport brand cigarettes.

Regarding the fourth factor, "consumers' degree of care is likely to be minimal in circumstances such as in the instant case, where the product at issue is widely available and inexpensive." *Lorillard Tobacco Company v. Division & Noble Amoco Corp.*, No. 03-C-5127, 2005 WL 309535, at *4 (N.D. Ill. Jan. 20, 2005) (*"Division & Noble Amoco Corp."*). The purchase of an individual pack of cigarettes in a convenience store such as Defendants' would not be made with the degree of care necessary to identify the counterfeit product.

The fifth factor, the strength of the Plaintiff's mark, also favors Plaintiff because Plaintiff's Newport brand cigarettes are one of the most popular brand names in the United States. It is undisputed that all five of the marks at issue are registered and protected, and four of the marks are deemed incontestable.

The sixth factor is accorded great weight but is not required in order to establish that a likelihood of confusion exists. *CAE, Inc.*, 267 F.3d at 685, and cases cited therein. There is no evidence of actual confusion on the part of any particular consumer of the J.J. Shell Food Mart. Nevertheless, in a case such as this, where even Plaintiff's own employees had difficulty distinguishing the counterfeit product from the genuine product, "actual confusion is inevitable." *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5.

The final factor is whether the Defendants knowingly or willfully sold goods bearing an infringing mark. There is evidence that the Defendants acted with less than good faith. The cigarettes were purchased at a significantly lower price than that offered by either of the distributors who regularly supplied the Defendants with genuine Newport cigarettes; the Defendants purchased the counterfeit cigarettes in question at a price of $34.00 per carton versus the $40.93 charged by the regular suppliers. (Pl. 56.1 ¶ 46). The evidence amply supports Plaintiff's Lanham Act claim.

Defendants have failed to raise a triable issue of fact as to whether it committed trademark infringement in violation of the Lanham Act; the Court grants partial summary judgment in favor of Plaintiff as to Count I.

### *Damages*

Because Plaintiff prevails on its trademark counterfeiting claim, it is entitled to recover damages. 15 U.S.C. § 1117. Section 1117 of Title 15 allows a Plaintiff to elect one of two alternative recovery options for trademark infringement: (1) the actual damages caused by the infringement, 15 U.S.C. § 1117(a); or statutory damages, 15 U.S.C. § 1117(c). The Lorillard Plaintiff requested an award of statutory damages under 15 U.S.C. § 1117(c). For an award of

9

statutory damages, the Defendants' liability under 15 U.S.C. § 1117(c) does not depend on whether or not there is a showing of intentional counterfeiting. Statutory damages are required for even "innocent" counterfeiting. Absent a finding of willfulness, statutory damages may be awarded in an amount "not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed for sale." Additionally, were this Court to find the use of the counterfeit mark to be willful, Section 1117(c)(2) allows for enhanced award of up to $1,000,000 per counterfeit mark.

The Court has broad discretion in setting the amount of a statutory damages award. *Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991). Courts interpreting Section 1117(c) have looked to the interpretation of the statutory damage provision of the Copyright Act, 17 U.S.C. § 504 (c). *Sara Lee v. Bags of New York*, 36 F. Supp. 2d 161, 166 (S.D.N.Y. 1999). In so doing, courts have looked beyond restitution of profit and restoration of injury to award damages, holding that "deterrence of future infringement is an important factor in determining statutory damages under the Copyright Act," and, thus, under the Lanham Act. *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952).

Similar cases in this District, resulting from infringement of Plaintiff's trademarks on counterfeit Newport brand cigarettes, have resulted in statutory damage awards ranging from $500 per infringed mark to $50,000 per infringed mark, or single violation of Lorillard's statutory rights under Section 1117(c)(1)-(2). *Cf. Lorillard Tobacco Company v. Division & Noble Amoco Corp.*, 2005 WL 309535, at *6 (awarding $500 per carton, for a total of $3,500) with *Lorillard Tobacco Co. v. S&M Cent. Serv. Corp.*, No. 03-C-4986, 2004 WL 2534378 (N.D. Ill. Jan. 8, 2004) (awarding $50,000 per trademark, for a total of $250,000).

10

The first inquiry is whether to award damages under Section 1117(c)(1) or under 1117(c)(2). In *S&M Central Services Corp.*, in a post-trial motion, the court awarded the defendant $50,000 per trademark infringement, for a total of $250,000 in damages under Section 1117(c)(2). In that case, there was a jury finding that the defendant acted willfully, or with willful blindness, in violating Plaintiff's trademark. In that case, the defendant purchased the counterfeit Newport brand cigarettes at a price below the market price, at a price of $34 per carton instead of the normal rate of $40 per carton. *S&M Cent. Serv. Corp.*, 2004 WL 2534378 at *7. Further, one of the witnesses in that case admitted that the price was low enough to make him inspect the tax stamps and the name brands on a sample of the cartons he purchased. *S&M Cent. Serv. Corp.*, 2004 WL 2534378 at *7.

In another case in this District involving counterfeit Newport brand cigarettes, the court awarded statutory damages of $500 per carton, noting that the plaintiff in that case acted innocently. *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5-6. Division & Noble Amoco purchased the cigarettes, which turned out to be counterfeit from its regular supplier, and no evidence that the price the defendant paid for the counterfeit cigarettes was less than the amount he normally paid for genuine Newport brand cigarettes. *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5. The court concluded: "Simply put, there is no evidence that Defendant knew, nor that he could have had any reason to recognize, that the cartons of Newports were not Lorillard's own product." *Division & Noble Amoco Corp.*, 2005 WL 309535, at *5. As a result, the court awarded $500 per carton in statutory damages under 15 U.S.C. § 1117 (c) (1). *Division & Noble Amoco Corp.*, 2005 WL 309535, at *6.

While the facts in this case bear more than a passing similarity to those in *S&M Central Services Corp.*, these facts, on a motion for summary judgment, do not add up to wilfulness or wilful blindness required to award damages under Section 1117(c)(2). On a motion for summary judgment, all facts must be construed in favor of the non-moving party. Thus construing the facts, this Court cannot find that the Defendants acted willfully, or with willful blindness. As a result, an award of non-intentional statutory damages will be awarded. Therefore, the Court will award statutory damages under Section 1117(c)(1). Under 1117(c)(1), the Court is entitled to award the Plaintiff up $100,0000 for each of the five marks that appeared on the carton of cigarettes. The Plaintiff asks this court to award $50,000 for each of the five marks that appeared on the counterfeit carton of cigarettes, a total of $250,000 in statutory damages under Section 1117(c)(1).

Even though the Court cannot find, on this motion for summary judgment, that the Defendants acted willfully, or with willful blindness, in determining the statutory award under Section 1117(c)(1), the Defendants' actions are not irrelevant. In computing the award amount, a court may consider factors such as "the circumstances of the infringement, and the efficacy of the damages as a deterrent." *Chi-Boy Music*, 930 F.2d at 1229. Even construing the facts in the light most favorable to the non-moving party, the facts do indicate that the Defendants willfully, or with willful blindness, accepted the value in purchasing counterfeit product for resale at a significantly lower price than was previously paid for the genuine product.

The Court, therefore, will enter an award of $1,500 per mark[3], a total of $7,500. This

---

[3] *Microsoft Corp. v. V3 Solutions, Inc.*, No. 01-C-4693, 2003 WL 22038593, at *14 n.9 (D. Ill. Aug. 28, 2003) ("statutory damages are measured per mark or copyright infringed, not per act of infringement or per counterfeit item produced."). *See also, S&M Cent. Serv. Corp.*, 2004

award is well below the maximum award provided by statute. Accordingly, it is reasonable and is likely to deter the Defendants from continuing the illegal behavior.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for partial summary judgment and awards $7,500 in statutory damages as to Count 1 of the Plaintiff's Complaint.

Date: October 27, 2005

JOHN W. DARRAH, Judge

United States District Court

---

WL 2534378, at *7. *But see, Division & Noble Amoco Corp.*, 2005 WL 309535, at *6.